IN THE MATTER OF PROCEEDINGS TO COMPEL
ROBERT J. MCAULEY AS A WITNESS IN A CRIMINAL
PROCEEDING IN CALIFORNIA.

[Cite as In re McAuley (1979), 63 Ohio App. 2d 5.]

6

(No. 39950—Decided April 12, 1979.)

*Mr. Barry Tarlow* and *Mr. Paul D. Cassidy,* for appellant John Monica.

*Mr. Donald A. Burns,* for appellee Robert J. McAuley.

KRENZLER, P. J.   This case involves the classical confrontation between a newsperson who contends he has an absolute, or at least a qualified, First Amendment right not to reveal confidential sources of information, and a defendant who contends that such information is essential to his right to a fair trial as provided by the Sixth Amendment to the United States Constitution.

One Julius Petro was shot and killed in Los Angeles, California, in January 1969, by one Raymond W. Ferritto who admitted the killing and stated that it was ordered by one John Monica. John Monica was then charged with ordering Ferritto to kill Julius Petro.

On January 19, 1978, the *Cleveland Plain Dealer* carried a news story, under the by-lines of Robert J. McAuley and Jim

Strang, stating that Raymond W. Ferritto, who was the admitted bomb slayer of racketeer Daniel J. (Danny) Greene, had told law enforcement authorities in California that he was hired to kill another Cleveland gangster, Julius Anthony Petro. Petro's dead body was found in a parked car at Los Angeles International Airport on January 12, 1969. The article then reviewed Petro's past criminal activities and further stated that:

"At the time of his slaying, Los Angeles police said they thought Petro was killed because of his activities as an enforcer for loan sharks.

"They now say Petro was a violent nuisance, tolerated by the underworld until his execution was finally ordered.

"Petro's death was ordered by Mafia chieftains there who were associates of Ferritto and James T. Fratianno, a West Coast enforcer, sources said.

"Federal authorities have placed Fratianno in heavily guarded seclusion and are seeking his cooperation in the Petro slaying as well as the Oct. 6 killing of Greene.

"California law enforcement officials say that Ferritto, Fratianno and other crime figures met shortly after Petro was slain, and they think Fratianno can substantiate Ferritto's account."

Attorneys for John Monica, desirous of having McAuley appear for questioning in Los Angeles as a material witness, filed a request for a Certificate of Materiality and Necessity for an Out-of-State Witness, pursuant to California Penal Code § 1334.3. In the request, the appellant asserted that he did not order the murder of Julius Petro; that the murder may have been ordered by Mafia chieftains; and that he is not a Mafia chieftain and has never been a member of the Mafia. Further, appellant stated that the information in the possession of Robert J. McAuley, his testimony, notes and records, the names and addresses of the persons who gave him information and all material which formed the basis of the article are clearly relevant to enable the defense to prepare for the preliminary hearing, investigate the case, establish the appellant's innocence at the preliminary hearing, and prove that Mafia chieftains rather than appellant, killed Julius Petro. Based on the foregoing, it was asserted that Robert J. McAuley is a necessary and material witness in the case as he

possesses information that is helpful and essential to the defense and clearly exculpatory of the defendant.

It is further contended that the information in the possession of McAuley concerning the meeting between Mafia figures after Petro's death is relevant because it will help establish that these Mafia figures, and not John Monica, ordered Petro's death. Counsel for Monica also contends that McAuley's testimony is necessary at an informant disclosure hearing where he can testify about the information related by the informant to the police and thus lay a foundation for disclosure of the informant. Further, it is asserted that even if the informant's name is not revealed, McAuley would be able to identify the police officer who received the information from the informant, and then the police officer could be called upon for information about the informant. The request further states that Robert McAuley has refused to come to California without a subpoena or to furnish the name of the source of the information over the telephone. Defendant contends he has no other way of acquiring the material except through a subpoena directed to Robert McAuley. It is requested that McAuley appear and bring with him (a) all written reports, raw notes, memorandums, tape recordings, etc., concerning information about the death of Julius Petro; (b) the names, addresses and telephone numbers of all persons who gave information to Robert J. McAuley and Jim Strang about the death of Julius Petro; (c) all information, including reports, notes, tape recordings, etc., concerning a meeting between Ferritto, Fratianno, and other crime figures shortly after Petro was slain; (d) the names, addresses and telephone numbers of all persons who gave information to Robert J. McAuley and Jim Strang about a meeting between Ferritto, Fratianno and other crime figures shortly after Petro was slain.

In addition to the request for a Certificate of Materiality and Necessity for an Out-of-State Witness, a declaration in support of the request for certification was filed by Richard Fannan, one of Monica's attorneys. Fannan stated that he had extensive discussions with John Monica and other persons familiar with organized crime activities in California, and on the basis of these conversations, he believes that John Monica is not now, and has never been, a Mafia chieftain, has never been alleged to be a Mafia chieftain, and is not now and has

never been a member of the Mafia. Fannan contended that he had spoken to Mr. McAuley and Mr. Strang; that both reporters confirmed that the information contained in the article is true; that Strang informed him that the information about Petro's death was provided by McAuley through his sources; and that both McAuley and Strang refuse to voluntarily disclose the identity of the source.

The remainder of Mr. Fannan's declaration is cumulative of the material that appeared in the certificate filed with the court. The gist of Mr. Fannan's declaration is that the information about the meeting between the crime figures shortly after Petro's death is relevant since it will most likely establish that the persons who organized and attended the meeting ordered Petro's murder and that discovery of the informant's name is essential in order to obtain information concerning Petro's death.

On September 8, 1978, Judge Trammell of the Los Angeles Municipal Court issued a Certificate of Materiality and Necessity for an Out-of-State Witness. The certificate stated that Robert J. McAuley is a necessary and material witness and that an appearance in California would not be an undue hardship for McAuley. The certificate contained a request that the Court of Common Pleas of Cuyahoga County issue its subpoena to Mr. McAuley directing him to appear on September 18, 1978, or as soon thereafter as he may be ordered to appear in California and to bring with him the documents and records listed in the request.

The Certificate of Materiality was filed in the Common Pleas Court of Cuyahoga County and is the basis for the case entitled "In Re Proceedings to Compel the Attendance of Robert J. McAuley in a Criminal Discovery Proceeding in California."

The transcript of proceedings in the Common Pleas Court of Cuyahoga County reflects that an assistant county prosecutor for Cuyahoga County represented the attorneys for John Monica who were not present at the hearing.

The assistant county prosecutor presented three exhibits on behalf of the defendant John Monica. The first, Exhibit A, was the aforementioned request for a Certificate of Materiality and Necessity for an Out-of-State Witness; the second, Exhibit B, was the declaration of Richard Fannan; and the third,

Exhibit C, was the Certificate of Materiality and Necessity for an Out-of-State Witness signed by Judge George Trammell of the Los Angeles Municipal Court. Attached to the initial papers was a check in the amount of $456 written to Robert McAuley for air travel, surface travel, and expenses. Nothing further was submitted on behalf of the defendant John Monica. Attorneys for McAuley submitted as exhibits affidavits of Robert J. McAuley and Donald Burns, McAuley's attorney.

McAuley's affidavit confirms that he wrote the newspaper article appearing in *The Plain Dealer* on January 19, 1978, and that the statements contained in the article are based largely on information furnished by one or more confidential sources whose identities he promised never to disclose. He states that he was not a witness to any of the events described in the article; that he does not have first-hand knowledge of any kind concerning the death of Julius Petro; that all information in his possession concerning Petro's death is hearsay, which he received from sources; that his notes on which the article is based contain the names of at least one confidential source; and that the disclosure of his notes would be tantamount to disclosure of the identity of one or more confidential sources. He states that he has been a reporter for *The Plain Dealer* for ten years, and is now an investigative reporter; that during this time he has relied heavily on information supplied by informants; and that his reputation for keeping his word about their identity has enabled him to find new sources of information. McAuley asserts that, if he were required to divulge his sources, his reporting career would be damaged, his usefulness as an investigative reporter ended, and more importantly, that the people's right to know and the newspaper's right to tell them would be damaged beyond repair. He states that if he were required to go to California, he would continue to assert the statutory and constitutional privilege to protect the confidentiality of his sources.

In his affidavit, Donald A. Burns stated that he is one of the attorneys for Robert McAuley; and that on October 30, 1978, Richard Fannan, one of the attorneys for defendant John Monica called Burns by telephone, and in their discussion Fannan stated that unless they received the names of McAuley's sources his testimony would not be useful and that

he did not believe that McAuley had other relevant information. Mr. Burns' affidavit stated that he called the clerk's office of the Municipal Court of Los Angeles and was advised that many defense motions were filed to compel the identification of police officers or prosecution informants and the disclosure of information obtained through electronic surveillance. He was further advised that the defendant's attorney served subpoenas *duces tecum* on at least seven law enforcement agencies, including the San Diego, San Francisco, and Los Angeles Police Departments, the United States Department of Justice, the Federal Bureau of Investigation, the Los Angeles County Sheriff's Department and the California Attorney General. He was told by the clerk's office that the trial judge was currently holding hearings regarding enforcement of the subpoenas.

No further evidence in the way of testimony or exhibits was introduced at the hearing and the assistant county prosecutor did not present an oral argument on behalf of John Monica. McAuley's attorney argued that McAuley was entitled to prevail because there was no showing that John Monica had exhausted all of his discovery potential; there was no showing of materiality of McAuley as a witness; and lastly, that the shield law provided for in R. C. 2739.12 protects McAuley from revealing his confidential sources of information.

It is noted that John Monica's attorney did not present any evidence that he had exhausted all of his efforts to obtain information that would be provided by the informant by other means, nor did he call McAuley as a witness to testify in regard to any unpublished or nonconfidential material in his possession. Also, Mr. Monica did not present in affidavit form a statement that he was not a member of the Mafia or a Mafia chieftain. Lastly, the defendant did not make a request for an *in camera* inspection by the court of the confidential information.

The trial court entered its judgment, finding that Robert J. McAuley had not been shown to be a material and necessary witness, and further, that, as a reporter, he is entitled to privilege under Ohio and California shield laws and under the First Amendment. The trial court denied the request for the issuance of the subpoena *ad testificandum* and a subpoena *duces tecum.*

An appeal has been taken from the trial court's order, and there are five assignments of error:[1]

"1. The court below erroneously applied the standard required for a finding of materiality and necessity under the uniform act to secure the attendance of witnesses from without a state in criminal proceedings.

"2. The court erroneously took into consideration the issue of a reporter's testimonial privilege in making its determination of materiality and necessity under the Uniform Act.

"3. The court erroneously determined that all the material testimony and documents to be produced by Robert McAuley are privileged under Ohio and California law and the First Amendment.

"4. The court's determination that McAuley has not been shown to be a 'material and necessary' witness under the Uniform Act was against the manifest weight of the evidence.

"5. The court's failure to issue its subpoena ad testificandum and subpoena duces tecum was an abuse of discretion."

Because appellant's five assignments of error raise the general question of whether the material presented to the trial court warranted a finding that McAuley was a material and necessary witness under R. C. 2939.25-.29, they will be considered together.

First it is noted that we are dealing with the statutes regarding attendance of witnesses from outside the state. R. C. 2939.25-.29.

R. C. 2939.26 provides in substance that if there is a criminal prosecution pending in another state, and a judge of that state certifies that a person in this state is a material witness and his presence is required, upon presentation of the

---

[1] Appellee filed a motion to dismiss this appeal on the basis that John Monica is not a real party in interest. We overruled this motion on the basis that John Monica is a real party in interest. The record demonstrates that a criminal case entitled *People of the State of California* v. *John Monica* is pending in California, and that a request for a certificate of materiality and necessity for an out-of-state witness was filed in that case. A trial judge of the Municipal Court of the County of Los Angeles, State of California, issued a certificate of materiality and necessity for an out-of-state witness, Robert J. McAuley.

Inasmuch as the principal case is captioned *People of the State of California* v. *John Monica,* and the special proceedings to compel attendance of out-of-state witness are a branch of that case and were initiated by John Monica, he is clearly the real party in interest and is entitled to maintain this appeal.

certificate to any judge of a court of record in the county in this state, a hearing will be held at which time the witness will be directed to appear. If, at the hearing, the judge determines that the witness is material and necessary and it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution in the other state, the judge shall issue a summons with a copy of the certificate attached directing the witness to attend and testify in the court where the prosecution is pending. In the hearing the certificate is prima facie evidence of all the facts stated therein.

While the certificate presented by the out-of-state court is prima facie evidence of all the facts stated therein, the person seeking the attendance of the witness has the burden of proving that he is a material and necessary witness. This determination will be made at the hearing in the court in the state where the witness resides.

The purpose of R. C. 2939.26 is to provide a means of effecting the attendance of a material and necessary witness in a criminal trial in another state. It applies to all witnesses who are considered material and necessary regardless of their status, and this includes news reporters. Further, all such witnesses must give whatever relevant information they have concerning the crime. This information must be given to either a grand jury, in pre-trial discovery proceedings, or at a criminal trial, unless the witness exercises a constitutional, common law, or statutory right. *See Branzburg* v. *Hayes* (1972), 408 U.S. 665.

Because the request for the Certificate of Materiality principally seeks the name of Mr. McAuley's confidential informant, and since Mr. McAuley is asserting a First Amendment and shield law privilege, we will determine whether Mr. McAuley is a material and necessary witness by applying the law concerning the divulgence of confidential news sources by news reporters.

In the present case the Los Angeles Municipal Court did present a certificate to the Common Pleas Court of Cuyahoga County that Mr. McAuley was a material and necessary witness, and a hearing was held before a judge of that court. It is noted that at a hearing to determine whether a newsperson is a material and necessary witness, the attorney for the defendant may appear and introduce evidence that he has exhausted

all reasonable means of obtaining the evidence by other sources. He may call witnesses, including the newsperson, and may examine him and review his unpublished, nonconfidential material, notes and tapes, and may also request an *in camera* inspection of the confidential material. All of this may be done by the defendant in an effort to meet his burden of presenting sufficient evidence which will demonstrate that he needs the name of the confidential informant because he has relevant evidence in regard to the defendant's guilt or innocence. Thus, in the present case, in order to determine whether Mr. McAuley is a material and necessary witness, we must review the transcript of proceedings made at the hearing in the Common Pleas Court.

Further, because John Monica wants Mr. McAuley declared a material and necessary witness in order to obtain the name of his confidential source, it will be necessary to review the applicable law as to when a news reporter must divulge the name of a confidential source of information.

In the constant tug of war between newspapers, defense lawyers, law enforcement officials and courts, newspersons contend that they are entitled to a free press; defendants argue that they are entitled to a fair trial; law enforcement officials assert that they are entitled to all relevant evidence from whatever source; and courts want to maintain their integrity by enforcing their orders.

Newspapers argue that the First Amendment to the United States Constitution provides an absolute right to publish without censorship and an absolute right to protect confidential sources of information. This argument is based on the public's right to know, even though a newspaper can decide which articles it will publish. Newspersons contend that, if denied the absolute right to protect their confidential sources, there will be a drying up of such sources and a chilling effect on obtaining the news, resulting in a denial of the public's right to know. In addition to their First Amendment constitutional argument, newspersons argue that they are also protected by state shield laws such as that enacted by the Ohio legislature, which provides that newspaper reporters are not required to reveal sources of information. R. C. 2739.12.

Defendants contend that if newspaper reporters have relevant information that will affect their right to a fair trial,

reporters are required to provide the information, even to the extent of divulging a confidential source. If this relevant information is protected by the First Amendment or state shield laws, defendants contend that they would be denied their right to a fair trial as mandated by the Sixth Amendment to the United States Constitution.

Law enforcement officials contend that newspaper reporters are to be viewed no differently than other citizens, and that if they have relevant information concerning a crime, they are required to appear before a grand jury and testify. It is their position that a newsperson does not have an absolute privilege conferred by the First Amendment. Newspersons must answer subpoenas, appear before grand juries, give testimony concerning crimes, and reveal confidential sources. Law enforcement officials also contend that they are entitled to the issuance of search warrants to secure criminal evidence that may be located on the premises occupied by a newspaper. *See Zurcher* v. *Stanford Daily* (1978), 436 U.S. 547.

Courts become involved in the free press-fair trial issue when newspersons refuse to comply with a subpoena *duces tecum* or other court order requiring their testimony, either before a grand jury, during pre-trial discovery proceedings, or at trial. The court then has no alternative but to cite the newsperson for contempt of court. The issue then arises as to whether a newsperson has an absolute or qualified privilege to protect his confidential sources of information.

Recently, attempts have been made to reconcile these competing theories. The law in regard to pre-trial publicity and prior restraints is now fairly well settled. *See Nebraska Press Association* v. *Stuart* (1976), 427 U.S. 539; *State, ex rel. Dayton Newspapers,* v. *Phillips* (1976), 46 Ohio St. 2d 457; *State, ex rel. Beacon Journal Pub. Co.,* v. *Kainrad* (1976), 46 Ohio St. 2d 349.

The case thus far with the most impact is *Branzburg* v. *Hayes, supra.* The principal issue in that case was whether a newsperson was required to reveal his confidential sources in proceedings before a grand jury. Also decided with *Branzburg* were *In the Matter of Paul Pappas* and *United States* v. *Earl Caldwell.* In all three cases, the reporters refused to reveal their confidential sources.

In *Branzburg* v. *Hayes, supra,* the newsman had wit-

nessed certain individuals possessing marijuana and making hashish from marijuana. In *In re Pappas,* the reporter was a television newsman-photographer called upon to report on civil disorders in New Bedford, Massachusetts, which involved fires and other turmoil. He gained entrance to Black Panther headquarters in the area and recorded and photographed a prepared statement read by one of the Black Panther leaders. As a condition of entry, he agreed not to disclose anything he saw or heard inside the store, except an anticipated police raid which he was free to photograph and report as he wished. Pappas wrote no story and did not otherwise reveal what occurred in the store while he was there. He was subsequently summoned before the grand jury and refused to answer questions about what had taken place inside headquarters while he was there, claiming a First Amendment privilege to protect confidential informants and their information.

In *Caldwell,* a reporter for the New York Times assigned to cover the Black Panther party and other black militant groups was summoned to appear before a grand jury to testify and bring notes and tape recordings of interviews given him for publication by officers and spokesmen for the Black Panther party concerning the aims, purposes, and activities of that organization. He objected to the scope of the subpoena.

The relevant law emanating from these three cases is that the public has a right to every person's evidence except for those persons protected by a constitutional, common law, or statutory privilege. Included in this class of persons not exempt from the normal duty of appearing before grand juries and answering questions relevant to a criminal investigation are newspersons. Requiring newspersons to testify before state or federal grand juries does not abridge the freedom of speech and press guaranteed by the First Amendment. Also, the First Amendment does not protect a newsperson's agreement to conceal the criminal conduct of his source or evidence thereof, and does not confer a privilege against compelling a newsperson to identify his informant. Further, newspersons may be required to furnish information to a grand jury without a showing by the state that a crime has been committed and that the newsperson has relevant information not available from other sources. *Branzburg* v. *Hayes, supra.*

The Supreme Court stated that it could not seriously

entertain the notion that the First Amendment protects a newsperson's agreement to conceal the criminal conduct of his source or his evidence thereof on the theory that it is better to write about the crime than to do something about it. Also, it could not accept the argument that the public interest in possible future news about the crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting these crimes reported to the press by informants. The court noted that the privilege is that of the reporter and not of the informant. Because agreements to conceal information relevant to the commission of a crime have very little to recommend them from the standpoint of public policy, the testimony of informers is available to the public when desired by grand juries or at criminal trials, and their identity cannot be concealed from the defendant when it is critical to his case. *Branzburg* v. *Hayes, supra; Roviaro* v. *United States* (1957), 353 U.S. 53.

In *Branzburg* v. *Hayes, supra,* at 710, Justice Powell wrote a separate concurring opinion, stating that the "asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions."

In his dissent in *Branzburg,* Justice Douglas stated that, in his view, newsmen have an absolute right not to appear before a grand jury. Where they are not involved in a crime, the First Amendment protects them against an appearance before the grand jury, and where they are involved in a crime, the Fifth Amendment stands as a barrier.

Justice Stewart was joined in his dissent by Justices Brennan and Marshall. He voiced concern that the holding of the majority invites state and federal authorities to undermine the historic independence of the press by attempting to annex the journalistic profession as an investigative arm of government which will in the long run harm rather than help the administration of justice. Justice Stewart stated that a reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a free flow of

information to the public, and it is this basic concern that underlies the constitutional protection of a free press. He further stated that informants are necessary to the news gathering process and that a promise of confidentiality is a necessary prerequisite to a productive relationship between a newsman and his sources and informants. When an investigation encroaches on First Amendment rights, the government must not only show that the inquiry is of compelling and overriding importance, but it must also convincingly demonstrate that the investigation is substantially related to the information sought. It must demonstrate that it is reasonable to think that the witness in question has that information and that there is not any means of obtaining information less destructive of First Amendment liberties.

It is noted that the concurring opinion of Justice Powell and the dissenting opinion of Justice Stewart have similar overtones, as both find it necessary to balance First and Sixth Amendment interests. Justice Stewart held that when a reporter is asked to appear before a grand jury and reveal confidential information, the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.

Although *Branzburg* is concerned principally with a newsman's testimony before a grand jury, it is our view that it is equally applicable to a defendant's Sixth Amendment right to a fair trial.

In deciding whether a reporter must reveal the name of his confidential source in either grand jury proceedings or in a criminal trial, most courts have applied the balancing test enunciated by Justice Powell and Justice Stewart in *Branzburg* v. *Hayes, supra.* These include *United States* v. *Pretzinger* (C.A. 9, 1976), 542 F. 2d 517, 520; *United States* v. *Liddy* (C.A. D.C. 1972), 478 F. 2d 586; *United States* v. *Orsini* (E.D.N.Y. 1976), 424 F. Supp. 229, 232, *affirmed,* (C.A. 2, 1977), 559 F. 2d 1206, *certiorari denied,* 434 U.S. 997; *United States* v. *Liddy* (D.C. 1972), 354 F. Supp. 208; *Rosato* v. *Superior Court of Fresno County* (1975), 51 Cal. App. 3d 190,

124 Cal. Rptr. 427, *certiorari denied,* (1976), 427 U.S. 912; *Farr* v. *Superior Court, County of Los Angeles* (1971), 22 Cal. App. 3d 60, 99 Cal. Rptr. 342, *certiorari denied,* (1972), 409 U.S. 1011; *Morgan* v. *State* (Fla. App., 1975), 325 So. 2d 40; *State* v. *Sandstrom, Application of Joe Pennington* (1978), 224 Kan. 573, *certiorari denied,* 47 U.S.L.W. 3555 (78-735); *In the Matter of Myron Farber and the New York Times Co.* in *State of New Jersey* v. *Jascalevich* (1978), 24 Crim. L. Rptr. (BNA) 2051, *certiorari denied,* (1978), 47 U.S.L.W. 3369; *People* v. *Marahan* (1975), 81 Misc. 2d 637, 368 N.Y.S. 2d 685; *State* v. *St. Peter* (1974), 132 Vt. 266; *Brown* v. *Commonwealth* (1974), 214 Va. 755, *certiorari denied,* (1974), 419 U.S. 966.

In *In the Matter of Myron Farber and New York Times Company, supra,* a reporter employed by the New York Times was charged with contempt of court for failure to comply with two subpoenas *duces tecum,* directing him to produce certain documents and materials compiled in the course of his investigation of certain criminal activities. A motion to quash the two subpoenas filed by the reporter, Farber, and the Times was ruled upon adversely to the Times, and an order was entered directing that the subpoenaed material be produced for an *in camera* inspection by the court. After Farber and the Times refused to produce the subpoenaed materials, a hearing was held on the contempt proceedings at which it was determined that both Farber and the Times had wilfully contemned the court's order. In an appeal taken to the New Jersey Supreme Court, Farber and the Times advanced the typical arguments of newspersons that if they were required to divulge the confidential source of their information, the dissemination of news would be seriously impaired because unless the identity of the sources remained secret, the news will not be forthcoming to newspapers. The final result would be a substantial lessening in the supply of available news on a variety of important and sensitive issues, all to the detriment of the public interest. They further contended that the privilege to remain silent emanates from the "free speech" and "free press" clause of the First Amendment. The New Jersey Supreme Court rejected this view, citing *Branzburg* v. *Hayes, supra,* and noted that five members of the United States Supreme Court had reached the conclusion that the First Amendment affords no privilege to newsmen who refuse

to appear before a grand jury and testify as to relevant information in their possession, even though in so doing confidential sources may be divulged. The court then stated that the obligation to appear at a criminal trial on behalf of a defendant who is attempting to enforce his Sixth Amendment rights is at least as compelling as the duty to appear before a grand jury. The court noted that the Sixth Amendment to the United States Constitution provides for compulsory process and the right to compel the attendance of witnesses and the production of documents and other material for which a defendant may have or believe he has a legitimate need in preparing and undertaking his defense. This means that a witness properly summoned would be required to testify, and that material demanded by a properly phrased subpoena *duces tecum* would be forthcoming and available for appropriate examination and use.

With regard to the shield law, the court said that whenever there is a conflict between a statute and a constitutional provision, the statute must fall. Inasmuch as the shield law was in conflict with the Sixth Amendment to the United States Constitution as well as the New Jersey Constitution, the court concluded that in the interests of justice and under the present facts, the shield law must yield.

The Supreme Court of New Jersey then addressed itself to the procedural mechanism for determining whether the confidential material will be disclosed to a defendant. The court held that the proper procedure is an *in camera* inspection which is used to ascertain the relevancy and materiality of the subpoenaed material and that such an inspection is not in itself an invasion of the statutory privilege. Rather, it is a preliminary step to determine whether, and if so, to what extent, the privilege must yield to the defendant's constitutional rights. The court noted that while a reporter may well be a unique repository of pertinent information, the defendant may not know the extent of this information. Thus, it is necessary for the trial judge to first examine the material before he can determine relevancy. It therefore becomes necessary for the trial court to inspect *in camera* the subpoenaed items so that it can make its determination on the basis of concrete materials rather than in a vacuum.

Before revealing the confidential information, the

reporter is entitled to a preliminary hearing to establish the threshold issue, to-wit: the relevancy in regard to the defendant's innocence. The test under these circumstances would be for the defendant to satisfy the trial judge by a fair preponderance of the evidence, including all reasonable inferences, that there was a reasonable probability or likelihood that the information sought by subpoena was material and relevant to his defense and it could not be secured from any less intrusive source and that the defendant had a legitimate need to see and otherwise use it. The court noted that this is not to be taken as a license for a fishing expedition in every criminal case where there has been investigative reporting, nor as permission for an indiscriminate rummaging through a newspaper's file. *In the Matter of Myron Farber and the New York Times Co., supra.*

As noted previously, other cases have held that the existence of a newsperson's privilege in a particular criminal case depends upon the balancing of the need of a defendant for a fair trial against the reporter's need for confidentiality. In *State* v. *Sandstrom, supra,* the Supreme Court of Kansas held that a newsperson has a limited privilege of confidentiality of information and identity of news sources. Whether a defendant's need for the confidential information or the identity of its source outweighs the reporter's privilege depends upon the facts in each case. As a general rule, disclosure has been required only in those criminal cases where it is shown that the information in the possession of the newsperson is material to prove an element of the offense, to prove a defense asserted by the defendant, to reduce the classification or gradation of the offense charged, or to mitigate or lessen a sentence imposed. When the information sought has a bearing on one of these areas, the newsperson's privilege must yield to the defendant's right to due process and a fair trial. *See State* v. *St. Peter, supra; Brown* v. *Commonwealth, supra.*

Further, it has been held that a newsperson need not divulge the source of his confidential information unless and until it has been demonstrated that there is no other adequately available source for the information and that the information is relevant and material on the issue of guilt or innocence. Under these circumstances disclosure must follow. *See State* v. *St. Peter, supra.*

Having reviewed the transcript of proceedings and the relevant law, we will resolve the issues raised in this appeal.

It is our view that a newsperson does not have an absolute First Amendment right not to reveal confidential sources, whether before a grand jury or in a trial of a criminal case. In addition, state shield laws do not provide an absolute right not to provide the name of a confidential informant. *Branzburg* v. *Hayes, supra; In the Matter of Myron Farber and the New York Times Co., supra.* Rather, the privilege of a newsperson is a qualified one in which the newsperson's right to protect the name of the confidential informant must be balanced against the Sixth Amendment right of a defendant in a criminal trial.

Also, a defendant does not have an absolute right to obtain confidential information from a newsperson. The defendant has the burden of proving by relevant evidence that the newsperson or the informant has information or evidence regarding the defendant's guilt or innocence. Before a reporter is required to give the confidential information or the name of a confidential source, there must be direct evidence and reasonable inferences flowing from the direct evidence that there is a reasonable probability that the reporter or the informant will provide relevant evidence of the defendant's guilt or innocence. Under these circumstances, a defendant is entitled to either the reporter's confidential information or the name of the informant.

In order for a newsperson to be declared a material and necessary witness under R. C. 2939.26 for the purpose of obtaining either confidential information or the name of a confidential source, the record must demonstrate that the evidence sought from the newsperson or the confidential source is relevant and material in regard to guilt or innocence. Because we are applying a balancing test, the person seeking to have a reporter declared a material witness must first demonstrate that there is no other available means of obtaining the confidential information in the reporter's possession, or that he has exhausted all of the available sources. Secondly, the movant must make an effort to obtain the information from the reporter by means other than by obtaining the name of the confidential source. This can be done at a hearing at which the reporter may be called to testify as to all material on

which the article was based, both published and unpublished, other than the confidential information. Lastly, the defendant should request an *in camera* inspection by the court of the confidential information. If, after this is done, there is a reasonable probability that either the newsperson or the informant will provide relevant evidence of the defendant's guilt or innocence, the defendant is entitled to the newsperson's confidential information or the name of the newsperson's informant.

As noted above, the material in the record before us does not contain any detail as to the broad discovery being conducted by Mr. Monica, nor does it demonstrate that he has not been able to obtain the information sought from McAuley from any other source. In fact, Mr. Burns' affidavit indicates that the discovery proceedings were still taking place. Also, Mr. McAuley was not called as a witness to testify about his article or any of his unpublished, nonconfidential notes, nor was a request made for an *in camera* inspection of McAuley's confidential material. In the present case, we are limited to the newspaper article, Mr. Fannan's statement, the certificate of the California court, the request for the certificate, and the affidavits of Mr. McAuley and Mr. Burns.

The trial court declined to issue the requested subpoenas on two bases. First, the trial court stated that it had not been shown that Robert J. McAuley is a material and necessary witness. Secondly, the court stated that, as a reporter, Robert J. McAuley is entitled to protect his confidential sources based on the statutory privilege under Ohio and California law and the First Amendment.

Upon reviewing the entire record we conclude that there was not sufficient evidence upon which to demonstrate that Robert J. McAuley was a material and necessary witness under R. C. 2939.25-.29.

However, the trial court is in error in holding that, as a matter of law, Robert J. McAuley as a reporter is entitled to an absolute privilege under Ohio and California law and the First Amendment for the reasons already stated.

Therefore, assignments of error 1, 2 and 3 are partially well taken, and assignments of error 4 and 5 are not well taken.

The judgment of the trial court that Robert J. McAuley

has not been shown to be a material and necessary witness and the denial of the subpoena *ad testificandum* and subpoena *duces tecum* for Robert J. McAuley to appear in California is affirmed.

*Judgment affirmed.*

DAY, J., concurs.

KRUPANSKY, J., dissents.

DAY, J., concurring. I have explained in another place[2] why the unchilled exercise of free expression is essential to the functioning of the Constitution. For this reason the reporters' privilege should be placed squarely on the First Amendment rather than dependent on the vagaries of legislation.

Breaches of the privilege are justified only in rare instances. One of these arises when the life or liberty of an accused can be shown to depend upon access to the reporter's information or sources. Whether the privilege or the access prevails is a matter of proof. The "Certificate of Materiality and Necessity For Out-of-State Witness"[3] filed in this case, though prima facie evidence of its content, contains virtually no facts. It does contain conclusions of law. These are not proof. The certificate incorporates a declaration in support by Counsel Richard Fannan. The declaration is unsworn. Whether it could be the basis for a perjury proceeding in California and, therefore, the equivalent of an affidavit does not appear. In any event, the declaration was not subjected to cross-examination, includes much that is hearsay, and suffers from many of the "conclusory" characteristics which fault the certificate.

The need for access is not supported by the record. Accordingly, I concur in the judgment.

KRUPANSKY, J., dissenting. I respectfully dissent from the majority for the reasoning contained in the following opinion. Appellant, John Monica, who designates himself the real party in interest in the notice of appeal, contends the trial court erred in denying the application of the California court

---

[2] See Chapter Nine, Social Research in Conflict With Law and Ethics, Bollinger Publishing Company, Cambridge, Massachusetts, 1976.

[3] The certificate was made by a judge of the Los Angeles Municipal Court.

to compel Robert J. McAuley, appellee, to attend criminal discovery proceedings in California as a necessary and material witness. The majority reaches the merits of this claim. However, a preliminary issue is presented. On November 8, 1978, Robert McAuley, appellee, filed a motion to dismiss the appeal on the grounds that appellant is not a proper party to take this appeal from the trial court's judgment. The majority overrules this motion. I find the motion is meritorious and would dismiss this appeal. Therefore, I must respectfully dissent from the judgment and the reasoning of the majority.

*The application to compel Robert J. McAuley to attend the criminal proceedings in California was filed by the California court in the Cuyahoga County Court of Common Pleas.* This action, taken by the California court, is governed by the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings (Act), codified in R. C. 2939.25 through R. C. 2939.29.

Under the Act, a state is empowered to request another state to compel a witness to attend criminal proceedings in the former state *only* if both states have enacted the Act. "It has been held that the Uniform Act does not extend the jurisdiction of the local courts beyond the territorial limits of the state, but depends upon principles of comity and adoption of the same act by the other state." 81 American Jurisprudence 2d Witnesses § 8. *See State* v. *Jordan* (1958), 83 Ariz. 248, 320 P. 2d 446, *certiorari denied* 357 U.S. 922, *rehearing denied* 358 U.S. 859; *State* v. *Blount* (1953), 200 Ore. 35, 264 P. 2d 419, *certiorari denied* 347 U.S. 962; 44 A.L.R. 2d 732. The statutory language supports this finding. Thus, the fact that Robert McAuley is located in Ohio does not extend the jurisdiction of the California court (in which the criminal proceedings against John Monica were instituted) to the state of Ohio. Necessarily, since the application to the Ohio court is not an extension of the criminal proceeding in the California court, this application must be considered as a separate and distinct action to which appellant was not a party.

R. C. 2939.26 provides in pertinent part as follows:

"*If a judge of a court of record* in any state which by its laws has made provision for commanding persons within that state to attend and testify in this state, *certifies* under the seal

of such court that there is a criminal prosecution pending in such court, or that a grand jury investigation has commenced or is about to commence, that a person being within this state is a material witness in such prosecution or grand jury investigation, and that his presence will be required for a specified number of days, *upon presentation of such certificate to any judge of a court of record in the county in this state in which such person is,* such judge shall fix a time and place for a hearing and shall make an order directing the witness to appear at a time and place certain for the hearing." (Emphasis added.)

R. C. 2939.26 requires the judge of the court in which the criminal proceedings are pending to present a certificate (application) to the Ohio court. There is no provision in the statute for the defendant to make application to the Ohio court. He is not contemplated as a party to the interstate action. Rather, a two-step process is provided in order to protect the rights of the defendant and the prospective witness.

The defendant's right to compulsory process has been extended by the Act to all other states where the Act has been enacted. To protect and expand a defendant's right to compulsory process, the defendant may petition the court in which the charges against him will be prosecuted to obtain a witness outside of the court's jurisdiction. If the court then finds the witness is necessary and material to defendant's case, the judge of that court will make an application to a court in the county where the witness is located to subpoena the witness to attend the criminal proceedings.

The second court holds a hearing at which the witness is required to attend. R. C. 2939.26 then provides as follows:

"*If at a hearing such judge* determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution or grand jury investigation in the other state, and that the laws of the state in which the prosecution is pending, or grand jury investigation has commenced or is about to commence, and of any other state through which the witness may be required to pass by ordinary course of travel, will give to him protection from arrest and the service of civil and criminal process, *he shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court*

*where the prosecution is pending,* or where a grand jury investigation has commenced or is about to commence, at a time and place specified in the summons. In any such hearing the certificate is prima-facie evidence of all the facts stated therein." (Emphasis added.)

It should be noted *the summons to appear is issued from the state where the witness is located and not from the state where the defendant is located.* Thus, the state in which defendant is located (California) cannot issue the summons. Rather, the state in which the witness is located (Ohio) has the prerogative to direct the witness to attend the proceedings as a matter of comity. This is a necessary result since, under the Act, the jurisdiction of the California court has not been extended to Ohio.

Clearly, the criminal proceedings brought by the state of California against appellant in California and the original proceedings brought by the state of California in Ohio to compel a witness to attend the California criminal matter are *two separate and distinct proceedings.* Appellant's status as a defendant in the California criminal proceedings does not confer upon him the status of a party in the original proceedings brought in Ohio by the state of California. Furthermore, appellant has never attempted to obtain party status by intervening in the original proceedings brought in Ohio.

Certainly, appellant is a very interested party. His defense could be adversely affected by Ohio's refusal to send appellee to California. However, appellant's recourse is in the California courts. His original petition was to the California court. If he feels he has been denied his right to compulsory process, he should have taken action against the California court for its failure to appeal the Ohio decision.

In *State, ex rel. Jones,* v. *Wilson* (1976), 48 Ohio St. 2d 349, the prosecuting attorney brought a mandamus action to compel a judge to apply the required sentence in the Ohio Revised Code against a defendant who had been improperly sentenced. The Court of Appeals issued a writ of mandamus and the trial judge complied. The defendant attempted to appeal from the issuance of the writ by the Court of Appeals. The Ohio Supreme Court dismissed the appeal because the defendant was not a party to the action and he had not intervened in the action.

In the instant matter, the appellant was not a party to the action in Cuyahoga County Court of Common Pleas and has not attempted to intervene in that action. It is true the Common Pleas Court allowed appellant to make an appearance and to present a brief in support of issuing the subpoena; however, this alone does not make him a party to the action. In *City of Cincinnati* v. *Kellogg* (1949), 86 Ohio App. 518, *affirmed* (1950), 153 Ohio St. 291, a taxpayer had requested the City Solicitor to bring suit against certain city officials. The taxpayer's motion to intervene was denied. The Ohio Supreme Court stated the following:

"Furthermore, the record discloses that the Court of Common Pleas instructed the taxpayer to be present at the hearing. He did attend, and *the court invited him to participate* in the presentation of the case. This invitation was accepted, and *the taxpayer expressed his views at length.*" 153 Ohio St., at 293. (Emphasis added.)

Nevertheless, the court found he was not a party and was not entitled to appeal. The judgment of the Court of Appeals was affirmed. The Court of Appeals had held as follows:

"There is no right independent of statute to appeal in any case by anyone. *There is no authority, certainly, justifying an appeal by one who was not a party to the action in the trial court,* and thus the trial court having committed no prejudicial error in refusing the taxpayer the right to intervene, *he stands as an outsider to the appeal from the final judgment dismissing the action.*" 86 Ohio App., at 523. (Emphasis added.)

Clearly, only a party to an action can appeal the decision of the court. *State, ex rel. Jones,* v. *Wilson, supra; Village of Amherst* v. *Wragg* (1941), 72 Ohio App. 303, *affirmed* (1942), 139 Ohio St. 371.

In the instant matter, appellant *did not attempt to intervene* in the proceedings in the trial court. He was allowed to submit a brief in support of the application. Further, he was indeed the real party in interest. However, he was not a party to the proceedings in the Ohio court. Only the California court was. As such, he had no right to appeal in his own name. Comity is given between Ohio courts and the courts of other states under the Act; by no means should the principles of comity extend to a citizen of one of these other states who acts in his own name under the Act.

Appellant's recourse was against the California court's failure to appeal the decision. The procedural requirements of the Act to institute this action in an Ohio court were adhered to by the courts of both states. There is nothing within the Act which extends any right of appeal to the defendant in the criminal proceedings (nor, for that matter, is the right of appeal specifically extended to the state of California under the Act). It is clear appellant could not bring this action in the Court of Common Pleas in his own name; only the state of California could institute the action in Ohio. It follows, the appellant cannot now take the place of the only proper party, the state of California, on appeal from the judgment of the Court of Common Pleas.

Since appellant was not a party to the proceedings in the Cuyahoga County Court of Common Pleas, this court has no jurisdiction over the person of John Monica, therefore, the appeal taken in his name should be dismissed.